UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DIANE M. GARVIN, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 99-B-0672-S |
| | } | |
| SOUTHTRUST BANK OF | } | |
| ALABAMA, N.A., a corporation; | } | |
| TOMMY MERRILL, an individual, | } | |
| | } | |
| Defendants. | } | |

**ENTERED**

**MEMORANDUM OPINION**

This case is before the court on Defendant SouthTrust Bank's Motion for Summary Judgment. Upon consideration of the record, submissions of counsel, oral argument, and the relevant law, the court find that the Motion is due to be granted.

## I. FACTUAL SUMMARY

Plaintiff has sued SouthTrust Bank of Alabama, N.A.[1] for alleged gender-based discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (Count I); race discrimination in violation of Title VII (Count II); negligent hiring, training, and supervision (Count III); assault and battery (Count IV); invasion of privacy (Count V); negligent investigation (Count VI); and retaliatory discharge (Count VII).

---

[1] Plaintiff also sued Tommy Merrill, individually. The court dismissed without prejudice those claims by separate Order entered March 7, 2000.

A.     **Plaintiff's Employment with Vinson Guard Service**

Plaintiff Diane M. Garvin ("plaintiff" or "Garvin") began working as a security officer

for Vinson Guard Service[2] ("Vinson") in July of 1998.  (Pl. Depo. p. 181, attached to Def.'s

Evid. Sub.)  Vinson contracts with its clients to provide security officers for various sites at its

clients' facilities.  (Pl. Depo. pp. 181-182.)  Vinson gives its security officers both long-term and

short-term assignments, as well as fill-in assignments for other guards.  (Pl. Depo. p. 182.)

Vinson assigned plaintiff to sites belonging to Vinson clients Copperwell, SouthTrust Bank, and

Motel 8.  (Pl. Depo. p. 182.)

Vinson set plaintiff's rate of pay, paid her wages, and withheld appropriate taxes.  (Pl.

Depo. p. 186.)  Upon employing plaintiff, Vinson provided her with a copy of its general

instructions for security guards.  (Pl. Depo. pp. 249-250; Exh. 5 to Pl. Depo.)  These instructions

listed plaintiff's job duties and the requirements of various assignments with Vinson clients.

(Exh. 5 to Pl. Depo.)  Vinson required plaintiff to wear her Vinson uniform to all assignments.

(Pl. Depo. p. 194; Exh. 5 to Pl. Depo.)

While employed at Vinson, plaintiff reported to several supervisors who had control over

her work.  (Pl. Depo. p. 184.)  Depending upon the assignment, plaintiff reported to Vinson at the

beginning of each shift by calling and checking in once she arrived at her post.  (Pl. Depo. p.

187.)  If plaintiff did not show up to her assignment, the client would call Vinson and report her

absence.  (Pl. Depo. p. 188.)

---

[2] Plaintiff did not name Vinson Guard Service as a defendant in this lawsuit.

**B.    Plaintiff's Assignment to SouthTrust Bank and Merrill's Alleged Conduct**

Vinson and SouthTrust Bank ("SouthTrust") entered into an agreement where Vinson

agreed to provide security officers to all SouthTrust locations in Birmingham, Alabama.  (Hollis

Aff. ¶ 12, attached to Def.'s Evid. Sub.; Exh. 5 to Hollis Aff.)  Some time around the week of

July 13, 1998, Vinson assigned plaintiff to a SouthTrust site.  (Pl. Depo. p. 188.)  Plaintiff

worked at the SouthTrust assignment from approximately July 13, 1998, ((Pl. Depo. p. 188),

until October 9, 1998, (*see* Hollis Aff. ¶ 8).  While employed with Vinson, plaintiff worked

approximately sixteen to twenty-five hours a week.  (Pl. Depo. p. 311.)  SouthTrust did not

control the method of payment, determine annual leave or retirement benefits, or have the ability

to terminate plaintiff or any other security officer supplied by Vinson.  (Hollis Aff. ¶ 11.)

Plaintiff worked for a brief part of the three-month period that she was assigned to

SouthTrust on the same shift with Tommy Merrill, (Pl. Depo. pp. 337, 379-80), a non-

supervisory security guard and SouthTrust employee, (Hollis Aff. ¶ 2).  Merrill had no authority

to hire, fire, demote, transfer, or discipline any individuals, plaintiff never witnessed him exercise

such authority, and plaintiff did not believe that Merrill had the authority to hire.  (Pl. Depo. p.

331-32, 365; Hollis Aff. ¶ 2; Exh. 1 to Hollis Aff.)  According to plaintiff, Merrill, as well as any

other SouthTrust employee who worked with her on a particular shift of her SouthTrust

assignment, was her direct supervisor.  (Pl. Depo. p. 195, 222-23.)

On the first day plaintiff reported to her assignment at SouthTrust Bank, Merrill met her

in the parking lot.  (Pl. Depo. p. 189.)  According to plaintiff, though she had never met or seen

Merrill before, he introduced her to SouthTrust employees as his new wife.  (Pl. Depo. pp. 189-

- 3 -

190.)  Plaintiff did not take these comments seriously or think anything of Merrill's remarks at the time.  (Pl. Depo. p. 191.)

On the first day of plaintiff's assignment at SouthTrust, Merrill also complimented her, told her that she was attractive, and asked if she had ever considered modeling.  (Pl. Depo. p. 192.)  Although plaintiff found Merrill's comments "offensive in a sense," she "didn't think anything of it."  (Pl. Depo. p. 193).  Also on plaintiff's first day with SouthTrust, Merrill sat very close to her and explained in a "playful" way and not a "professional" manner how the security equipment worked.  (Pl. Depo. pp. 198-99.)  Plaintiff cannot remember, but she thinks Merrill hugged her on her first day at the SouthTrust assignment.  (Pl. Depo. p. 208.)  According to plaintiff, all of this activity occurred on her first day at SouthTrust during the six hours from 4:00 p.m. to 10:00 p.m.  (Pl. Depo. p. 208.)

On plaintiff's second day at SouthTrust, Merrill told her that he missed her.  (Pl. Depo. p. 212.)  Plaintiff testified that "I just figured this was all just guard talk.  I mean, when you are on a shift, you read about or see movies about them eating doughnuts and stuff and watching TV.  I thought this was all part of guard talk.  I didn't think anything of it."  (Pl. Depo. p. 212.)  On that same day, Merrill again told plaintiff that she should consider modeling and stated "[y]ou look like you really could get you a job here somewhere in the company."  (Pl. Depo. p. 213.)  Merrill then suggested that plaintiff put in an application at SouthTrust using his name as a reference. (Pl. Depo. p. 213.)

SouthTrust has a policy that if a SouthTrust employee refers an applicant who is actually hired by SouthTrust, the employee will receive a bonus of 300 dollars.  (Hollis Aff. ¶ 4.)  Merrill would have been eligible for this bonus had plaintiff been hired by SouthTrust.  (Hollis Aff. ¶ 4.)

- 4 -

Merrill told plaintiff that he knew a woman with SouthTrust Human Resources named Mavinee and that he could get plaintiff a job at SouthTrust. (Pl. Depo. p. 217.)

According to plaintiff, also on her second day at SouthTrust, Merrill breathed heavily, grabbed her at her waist, touched her buttocks and breasts, and placed her hand on his erect penis. (Pl. Depo. pp. 216, 225-226.) In response to Merrill's conduct, plaintiff told Merrill "get off me. I'm not into you." (Pl. Depo. p. 216.) Again, plaintiff did not think anything of Merrill's conduct and believed that "these things happen at times and stuff." (Pl. Depo. p. 216.)

According to plaintiff, on her third day at SouthTrust, Merrill pulled out his penis and placed her hand on it and forced her mouth on his penis. (Pl. Depo. pp. 229-230.) Merrill also asked to see plaintiff's breasts and after she lifted her shirt, he touched her breasts with his hands and mouth. (Pl. Depo. pp. 230-32.) Sometime during the first three days of plaintiff's SouthTrust assignment, plaintiff remembers that Merrill once had her massage his penis while he spoke to his wife on the telephone, (Pl. Depo. pp. 240-41), and once while she was undressing in the guard shack bathroom, he "peeked" in and saw her underwear, (Pl. Depo. pp. 248-51). According to plaintiff, during her assignment at SouthTrust, Merrill made her touch his penis between one and ten times. (Pl. Depo. p. 244.)

In addition to the alleged sexual advances by Merrill, plaintiff alleges that Merrill made implied threats about the termination of her job. (Pl. Depo. pp. 220, 232.) According to plaintiff, Merrill's "exact words was you do need the job or something like that." (Pl. Depo. p. 220.) Plaintiff states that this language made her "afraid that he would have fired me." (Pl. Depo. p. 232.)

Additionally, plaintiff claims Merrill made comments that his father-in-law was a member of the Gambino crime family and recalls Merrill showing her his gun though plaintiff believed the post at SouthTrust to be an unarmed post. (Pl. Depo. pp. 234-36.) On at least one occasion during her assignment at SouthTrust, plaintiff carried her own .357 Magnum handgun. (Pl. Depo. p. 236.)

According to plaintiff, all of the alleged conduct by Merrill happened in the first three days of her assignment with SouthTrust. (Pl. Depo. p. 337.) Plaintiff never reported any of Merrill's alleged threats about her job or any of Merrill's alleged sexual advances to anyone at SouthTrust. (Pl. Depo. p. 251-252.)

## C. Plaintiff's Communications with Merrill Outside of SouthTrust Assignment

Plaintiff admits that she called and e-mailed Merrill when they were not working together. (Pl. Depo. pp. 259-261.) Plaintiff also acknowledges that she cooked food for Merrill and took it to him at SouthTrust while he was working. (Pl. Depo. p. 261.) Plaintiff lost count of the number of times she called Merrill and admitted she "constantly bothered him about [her] job." (Pl. Depo. p. 256.) Plaintiff cannot recall if Merrill ever asked her to stop calling him, but recalls that Merrill "had gotten a little nervous when I kept pestering him for a job." (Pl. Depo. p. 262.) At her deposition, plaintiff identified two e-mails that she sent to Tommy Merrill in late September of 1998. (Pl. Depo. pp. 269-71; Exh. 7 to Pl. Depo.) The September 20, 1998, e-mail from plaintiff to Tommy Merrill includes the following:

> Well, well, well stranger, how are you today? By this time, you probably received my previous messages. You don't owe me this, but are there any more secrets that I will unravel? . . . . Listen I appreciate what you said to Mavinee about me. **If you like to meet for lunch or anything, here is my pager again #889-6954. You still have my home number and so on.** After uncovering all this, I'm gonna

try my luck on the net (reason - your relationship is too close for me, I'm no sucker of [sic] fool to be next in line with him) . . . . P.s. If you need to contact me, you know how . . . . I was only interested in you, now we got another house whole [sic] (juan's) to worry about . . . . D. garvin.

(Exh. 7 to Pl. Depo.) (emphasis added.)

The second e-mail plaintiff identified was dated Tuesday, September 22, 1998, and

includes the following:

Tommy: Hello, I'm back again.  Missed me?  What I meant the other day was, to disregard the third message sent.  I sent a total of three e-mails.  The first two were kind and the third was sort of cruel.  Although I got carried way, I felt it was true (lawanda looks like a bald man with makeup, she has a deep voice and appears to be huge in size).  Is this where you spend all your time? Chasing these people?  The kid is too fresh for her age.  Is she the reason you felt like a pervert that day (I was dressed in black).  Are you waiting for her to grow-up too.  She is an ugly, long headed, fresh ass little kid (with an ugly, ugly nose) . . . . I really wanted to stay over here with you, but that may be impossible . . . . I know you liked the first two mails sent . . . . You never commented on them so I'll assume you are well (healthwise).  You must be mad at me . . . . Okay, I keep accusing you of certain things, and I really do not have a right to (I also remember how short bald, bumpy faced, dirty looking and ugly Naomi was).  So you can be mad. **If you want to stop by 812-e[3] anytime, you are always welcome.  In case you want to call, here is my number again 942-8916 (although you don't have to).  Yeah, that's right, why don't you stop by?**  Listen, nothing to worry about, **I don't like leaving my number on the net.  Those guys are not my cup of tea.  Guess who is?  Any clue?  You . . . . I know we can't really talk.  Ps. meant to tell you the beard looked great.  You like the back entrance and I like the front (lap).  What are we going to do?** Dgarvin.

(Exh. 7 to Pl. Depo.) (emphasis added.)

### D.    Plaintiff's Application for Employment at SouthTrust

On September 23, 1998, plaintiff applied for a job as a security guard at SouthTrust and

used Merrill's name as a reference.  (Hollis Aff. ¶ 3; Exh. 2 to Hollis Aff.)  Plaintiff admits that

---

[3]In plaintiff's application for employment with SouthTrust, she identified 812-e as her home apartment number.  (Exh. 2 to Hollis Aff.)

she actively sought assistance from Merrill with her application for employment with SouthTrust

(Pl. Depo. pp. 256, 262.) On September 29, 1998, SouthTrust sent plaintiff a letter rejecting her

for a job with SouthTrust because of a negative credit history and information included on her

credit report. (Pl. Depo. p. 256; Exhibit 6 to Pl. Depo.)

**E.     Merrill's Complaint of Plaintiff Sexually Harassing Him**

On October 2, 1998, Mavinee Brake[4] ("Brake"), SouthTrust's Assistant Vice President

for  Human Resources, received a telephone call at home from Merrill complaining that plaintiff

sexually harassed him. (Hollis Aff. ¶ 5; Exh. 3 to Hollis Aff.)[5]  Merrill reported to Brake that

plaintiff was calling him and would not leave him alone. (Hollis Aff. ¶ 5; Exh. 3 to Hollis Aff.)

SouthTrust had Merrill complete an employee complaint form regarding his report of plaintiff's

sexually harassing conduct. (Hollis Aff. ¶ 6.)  In that employee complaint form, Merrill reported

that plaintiff "harassed [him] sexually and by phone," "threatened to spread rumors," "[e]xposed

herself," and "tried on numerous ocasions [sic] to get [him] to come to her [apartment]." (Exh. 4

to Hollis Aff.)

**F.     Plaintiff's Report of Merrill's Alleged Conduct to Vinson Guard Service**

At some point after Merrill reported to SouthTrust that plaintiff was sexually harassing

him, plaintiff reported to Vinson that Merrill was sexually harassing her.  Plaintiff does not

---

[4] Brake is a Recruiter for SouthTrust and her job duties include interviewing, performing
credit and background checks, and employee placement. (Hollis Aff. ¶ 5.)

[5] During the time that plaintiff was assigned to SouthTrust, SouthTrust maintained a sexual
harassment policy, a copy of which was posted at the SouthTrust Wildwood location. (Hollis
Aff. ¶ 13; Exh. 6 to Hollis Aff.)  Merrill attended a course entitled "Civil Treatment for
Employees" at SouthTrust on October 7, 1997. (Hollis Aff. ¶ 14; Exh. 7 to Hollis Aff.)

remember exactly when, but she reported Merrill's alleged conduct to Jim Barr at Vinson either on October 7, 1998, or some time during the first week of November. (Pl. Depo. pp. 252, 262-263, 379-80.) At the time plaintiff reported Merrill's conduct to Vinson, she was no longer assigned to work with Merrill and Merrill had not engaged in any alleged inappropriate touching of plaintiff since the time Merrill was assigned to a different shift.[6] (Pl. Depo. p. 263-64, 379-80.) Plaintiff reported Merrill's conduct to Vinson because "[she] felt [she] had better beat him to the punch and tell them that he has been harassing [her]." (Pl. Depo. p. 272.) After plaintiff reported Merrill's conduct to Vinson, Vinson transferred her from her SouthTrust assignment at the Wildwood location and gave plaintiff three options for a transfer to another location, including another SouthTrust assignment at a different location. (Pl. Depo. pp. 266-268.)

## G.    SouthTrust's Investigation of Merrill's Complaints

On October 7, 1998, five days after Merrill reported that plaintiff was sexually harassing him, SouthTrust received a call from Greg Carter with Vinson advising that one of Vinson's employees assigned to SouthTrust had made a complaint to his office concerning sexual harassment by Merrill. (Hollis Aff. ¶ 7.) On October 9, 1998, Merrill was placed on suspension without pay pending the conclusion of the investigation. (Hollis Aff. ¶ 8.) SouthTrust Security Director John Kines ("Kines") requested that Vinson temporarily reassign plaintiff to another location during the investigation. (Hollis Aff. ¶ 8.)

---

[6] Plaintiff cannot recall exactly when Merrill was assigned to a different shift, but she recalls that she waited more than thirty days from the time he was assigned to a different shift before reporting any alleged conduct to Vinson. (Pl. Depo. pp. 379-80.)

SouthTrust promptly conducted an investigation into the complaints of both Merrill and plaintiff. (Hollis Aff. ¶ 9.) Kines and SouthTrust Vice-President of Human Resources Dene Hollis ("Hollis") conducted the investigation and interviewed the employees who worked with Merrill and plaintiff. (Hollis Aff. ¶ 9.) After spending considerable time investigating the situation, Hollis and Kines concluded that the information indicated that Merrill and plaintiff may have had some form of a consensual relationship and that SouthTrust would not delve further into the "he said, she said" situation at that time. (Hollis Aff. ¶ 9.) SouthTrust indicated that any further reports of inappropriate behavior would be appropriately dealt with and counseled all individuals involved. (Hollis Aff. ¶ 9.) SouthTrust employee Merrill, however, chose not to return to work at SouthTrust and submitted a letter of resignation on November 1, 1998. (Hollis Aff. ¶ 10.)

## H.    Plaintiff's Police Report

On October 15, 1998, plaintiff filed a police report with the Birmingham Police Department against Tommy Merrill for sodomy. (Pl. Depo. p. 42; 10/15/98 Police Report, attached to Def.'s Evid. Sub.) Plaintiff testified in her deposition that she could not recall the number of police reports she had filed against individuals, including individuals with whom she worked, in the past because they were too many to remember. (Pl. Depo. pp. 43-44, 306.) On October 16, 1998, just one day after filing the police report against Merrill, plaintiff admits calling Merrill at home, though she cannot remember why she was calling him. (Pl. Depo. pp. 345-46, Exh. 9 to Pl. Depo.)

**I.     Plaintiff's Voluntary Resignation from Vinson Guard Service**

Plaintiff first testified in her deposition that she voluntarily resigned from her job at

Vinson while on an assignment at Motel 8.  (Pl. Depo. pp. 281-282.)  Plaintiff forgot the reasons

why she resigned from Vinson but she "told them something along the lines that [she] felt that

[her] assignments like, for instance, when they offered [her] the Cooper Green Hospital was

something that [she] could not accept."  (Pl.  Depo. p. 282.)  Plaintiff later testified that she never

gave her resignation to Vinson, Vinson never terminated her services, she could still call Vinson

for assignments, and that she found other employment.  (Pl. Depo. pp. 285-86.)

**J.     Plaintiff's EEOC Charge and Lawsuit**

On November 30, 1998, plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC") and on December 15, 1998, the EEOC issued

upon request a Notice of Right to Sue.  On March 19, 1999, plaintiff filed the present lawsuit

against SouthTrust and Merrill alleging a sexually hostile work environment, race discrimination,

retaliation, as well as state law claims of negligent hiring, training, and supervision, assault and

battery, invasion of privacy, and negligent investigation.  Plaintiff's employer Vinson Guard

Service was not named in the Complaint.  (*See* Compl.)

## II. DISCUSSION

**A.     Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the

pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  The party asking for summary judgment bears the initial burden of

showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**B.    Plaintiff's Employment Status with SouthTrust**

Plaintiff claims that she was subjected to unlawful sexual discrimination under Title VII which prohibits discrimination by an employer against an employee on the basis of sex. SouthTrust disputes that plaintiff was an employee of SouthTrust.  Title VII defines an "employer" as " a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . ." 42 U.S.C. §2000e(b).  An "employee" is defined as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  If

plaintiff is not an employee of SouthTrust, plaintiff is not subject to Title VII's protections.

*Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 339-340 (11th Cir.), *cert. denied*, 459 U.S. 874 (1982).

In *Cobb*, the Eleventh Circuit adopted the "hybrid" test for determining whether an

individual is an employee under Title VII, stating:

> We conclude therefore that the term "employee" in cases under Title VII is to be
> construed in light of general common-law concepts.  The analysis of the question
> in a given case should take into account the economic realities of the situation . . .
> . This does not mean, however, that the economic realities with respect to the
> dependence of the individual on the employment will control.  Rather, it is the
> economic realities viewed in light of the common law principles of agency and
> the right of the employer to control the employee that are determinative.

*Cobb*, 673 F.2d at 340-41.  The *Cobb* court also set forth a list of factors to guide a court's

determination of whether a party is an employee or an independent contractor:

> (1) the kind of occupation, with reference to whether the work is usually done
> under the direction of a supervisor or is done by a specialist without supervision;
> (2) the skill required in the particular occupation; (3) whether the "employer" or
> the individual in question furnishes the equipment used and the place of work; (4)
> the length of time during which the individual has worked; (5) the method of
> payment, whether by time of by the job; (6) the manner in which the work
> relationship is terminated; i.e., by one or both parties, with or without notice and
> explanation; (7) whether annual leave is afforded; (8) whether the work is an
> integral part of the business of the "employer;" (9) whether the worker
> accumulates retirement benefits; (10) whether the "employer" pays social security
> taxes; and (11) the intention of the parties.

*Cobb*, 673 F.2d at 340.  "[T]he hybrid test . . . emphasize[s] the hiring party's right to control the

manner and means by which the work is accomplished."  *Daughtrey v. Honeywell, Inc.*, 3 F.3d

1488, 1496 (11th Cir. 1993); *accord Garcia v. Copenhaver, Bell, & Associates, M.D.'s, P.A.*,

104 F.3d 1256, 1266 (11th Cir. 1997).

In this case, the evidence reflects that SouthTrust did not exercise the requisite control

over plaintiff to make her an employee of SouthTrust for purposes of Title VII.  Plaintiff was

performing work that can be performed without supervision.  For example, plaintiff testified that when Vinson assigned her to Motel 8, no one from Vinson or Motel 8 watched over her work. (Pl. Depo. p. 184.)  Security work can be done without supervision and the Vinson rules contemplate no supervision of its security guards.  (Exh. 5 to Pl. Depo.)

Plaintiff argues that she was to follow orders from SouthTrust employees and that SouthTrust controlled plaintiff's work.  Even if plaintiff can establish that SouthTrust exercised some supervision over her work during the three-month period in which she was on the SouthTrust assignment, plaintiff cannot establish that the supervision amounted to supervision of performance within the meaning of the hybrid test.  *See, e.g., EEOC v. Zippo Mfg. Co.*, 713 F.2d 32, 38 (3rd Cir. 1983) (finding that periodic monitoring of a sales representative did not amount to supervision of performance within the meaning of a more liberal test than the hybrid test).

Turning to the remaining *Cobb* factors, the court is of the opinion that they also weigh against considering plaintiff an employee of SouthTrust for purposes of Title VII.  First, plaintiff wore Vinson's required uniform.  (Pl. Dep. p. 194; Exh. 5 to Pl. Depo.)  Second, plaintiff only worked at the SouthTrust assignment for approximately three months for approximately sixteen to twenty-five hours a week.  (Pl. Depo. pp. 188, 263, 266, 311.)  Third, the method of payment, the ability to terminate the work relationship, the determination of annual leave, retirement benefits and the payment of Social Security taxes were all controlled by Vinson and not SouthTrust.  (Pl. Depo. 186; Hollis Aff. ¶ 11.)  Fourth, security guard work is not an integral part of SouthTrust Bank, which is a financial institution.

Finally, the intent of the parties weighs against considering plaintiff an employee of SouthTrust.  Such intent is evidenced by the contract between Vinson and SouthTrust which

- 14 -

states that SouthTrust is a client of Vinson and that Vinson is to provide guard service to SouthTrust. (Hollis Aff. ¶ 12; Exh. 5 to Hollis Aff.) The contract states that Vinson shall provide "[a]ll SouthTrust Bank locations in the Birmingham area" with a "[u]niformed security officer to perform duties as set forth by the client and approved by Vinson Guard Service, Inc." (Exh. 5 to Hollis Aff.)

In addition to the contract between Vinson and SouthTrust, the Vinson rules for security guards strongly indicate that it was the intent of Vinson that the security guard's supervisor at Vinson control the security guard's work and not the client, in this case, SouthTrust. (Exh. 5 to Pl. Depo.) For example, the following rules are included in the instructions to Vinson security guards: No. 6 : "You will make sure you understand all requirements of your assigned shift. If you have any doubts as to how to handle a situation you should immediately contact your supervisor;" No. 7: "You will be polite and courteous at all time while on client property, however you should never deviate from your security instructions;" No. 8: "You must accept orders and carry them out as given to you by your supervisor;" No. 10: "You will notify the office should you receive any change in instructions from our client;" No. 12: "You will call the office and check in upon arriving at your assigned post;" No. 13: "You will not accept money or gratuity from anyone for any reason while on post or in a Vinson uniform;" No. 14: "You will not make arrangements to swap shifts or parts of shifts with another officer without prior approval of the Vinson office." (Exh. 5 to Pl. Depo.)

The only factors that arguably weigh for considering plaintiff an employee of SouthTrust are plaintiff's work location on SouthTrust's premises (which is inherent in a guard service operation) and SouthTrust's minimal supervision over plaintiff during that three-month period.

- 15 -

These two factors, however, are not sufficient to create a genuine issue of material fact as to plaintiff's employment status. *Cobb* and other district courts using the *Cobb* analysis have addressed this issue on a defendant's motion for summary judgment and found individuals not subject to Title VII protection despite the existence of mixed evidence. *See, e.g., Fronduti v. Trinity Industries*, 928 F. Supp. 1107, 1111-13 (M.D. Ala. 1996) (granting summary judgment in favor of defendant and holding that consultant was an independent contractor and not employee under the ADEA where some factors weighed in favor of employment status and some in favor of independent contractor status); *Holloman v. Northeast Georgia Area Development Commission*, 740 F. Supp. 1571, 1576-77 (M.D. Ga. 1990) (granting summary judgment to defendant and finding nutrition coordinator an independent contractor and not employee though the evidence regarding the nutrition coordinator's status was mixed); *Gordon v. The Birmingham News*, CV No. 89-PT-0436-S, 1989 WL 222730, at *2 (N.D. Ala. June 27, 1989) (granting summary judgment to defendant and finding that "the only evidence of an employee relationship is plaintiff's subjective conclusions at this stage."); *cf. Garcia*, 104 F.3d at 1266-67 (finding a genuine issue of material fact where alleged employer oversaw plaintiff's work, scheduled his shifts, and paid him on an hourly basis); *Daughtrey*, 3 F.3d at 1492-97 (finding a genuine issue of material fact where the alleged employer furnished plaintiff with all equipment and supplies, required her to work at its facilities, paid her an hourly wage, could terminate her at will, and required her to perform services personally).[7]

---

[7]Plaintiff cites to *Virgo v. Riviera Beach Associates*, 30 F.3d 1350 (11th Cir. 1994), in attempting to persuade the court that plaintiff's employment status is a fact question. *Virgo*, however, addresses the joint employer concept, which is not at issue in this case.

Because plaintiff has failed to put forth sufficient evidence on which a reasonable jury could find that she was an employee of SouthTrust, defendant SouthTrust is entitled to judgment as a matter of law on all of plaintiff's Title VII claims.

## C.     Plaintiff's Hostile Work Environment Claim

Alternatively, even assuming SouthTrust was plaintiff's employer for Title VII purposes, plaintiff cannot establish that she was subjected to a hostile work environment.  Plaintiff alleges that she was sexually harassed by SouthTrust employee Merrill.  Plaintiff alleges that Merrill was her direct supervisor.  (Pl. Depo. pp. 195, 222-23.)  However, undisputed evidence in the record shows that Merrill held the position of non-supervisory security guard during the three-month time period in question and did not have the authority to hire, discipline, or fire individuals at SouthTrust. (Hollis Aff. ¶ 2, Exh. 1 to Hollis Aff.)  Plaintiff's bald assertion that Merrill was her direct supervisor in the face of evidence that Merrill did not hold such a position does not amount to evidence that Merrill was her direct supervisor. *See Lovelace v. Federal Express Corp.*, No. 1:97-CV-3267-JTC, 1999 U.S. Dist. LEXIS 17683, at *20-*22 (N.D. Ga. September 24, 1999) (holding that where alleged harasser had no authority to hire, fire, demote, transfer, or discipline the plaintiff, alleged harasser did not qualify as a supervisor under *Faragher*) (citing *Parkins v. Civil Constructors, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998)).

Merrill was plaintiff's coworker, not her supervisor, and had no authority to grant or deny plaintiff a job benefit.  In order to establish a claim of discrimination based on sex, or sexual harassment, plaintiff must show that the alleged conduct created a hostile working environment. The five elements necessary for establishing a hostile environment claim are: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual

harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *Henson v. City of Dundee*, 682 F. 2d 897, 903-905 (11th Cir. 1982).

### *1.   Unwelcomeness*

"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986). The conduct at issue "must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson*, 682 F.2d at 903. Therefore, "[t]he correct inquiry is whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor*, 477 U.S. at 68.

In this case, plaintiff testified in her deposition regarding Merrill's alleged conduct that she told Merrill "get off me. I'm not into you. You are a married man" and that she told him "stop, I'm not playing." (Pl. Depo. pp. 216-17.) Plaintiff also testified that, at least initially, she "didn't think anything of it," that she "thought this was all part of guard talk," and that "these things happen at times and stuff." (Pl. Depo. pp. 193, 212, 216.) More importantly, plaintiff admits that at some point between July and October of 1998, when the alleged harassing conduct occurred, she called Merrill at work and at home, she sent Merrill e-mails, she cooked dinner for him, and brought dinner to him at SouthTrust. (Pl. Depo. pp. 259-261.) In fact, plaintiff identified an email she sent to Merrill in late September of 1998 in which she wrote "If you want

to stop by 812-e[8] anytime, you are always welcome." (Exh. 7 to Pl. Depo.). In the same e-mail, plaintiff also stated that "[t]hose guys are not my cup of tea, guess who is? Any clue? You." (Exh. 7 to Pl. Depo.).

Additionally, in determining whether conduct is unwelcome, courts have considered the timing in which the plaintiff registers a complaint. *See, e.g., Balletti v. Sun-Sentinal Co.*, 909 F. Supp. 1539, 1547-48 (S.D. Fla. 1995) (holding that plaintiff cannot be characterized as victim of sexually hostile environment where plaintiff first apprised management of incident several weeks after it occurred and where plaintiff participated in the very conduct of which she complained). *Weinsheimer v. Rockwell International Corp.*, 754 F. Supp. 1559, 1564 (M.D. Fla. 1990), *aff'd*, 949 F.2d 1162 (11th Cir. 1991) (conduct was not "unwelcome" where plaintiff did not report offensive behavior until months after it happened). In this case, plaintiff waited at least thirty days after the conduct before notifying her employer, Vinson. (Pl. Depo. 379-80.)

Based on plaintiff's e-mails to Merrill and the timing of her complaint to Vinson, the court is of the opinion that plaintiff has failed to set forth sufficient evidence on which a reasonable jury could find that plaintiff was subjected to unwelcome sexual advances. Therefore, SouthTrust's motion for summary judgment as to plaintiff's sexual harassment claim is due to be granted as a matter of law.

### 2. *Awareness; Prompt Remedial Action*

Even if plaintiff could establish that she was subject to unwelcome sexual advances by Merrill that were sufficiently severe to alter the terms and conditions of her employment,

---

[8]In plaintiff's application for employment with SouthTrust, she identified 812-e as her home apartment number. (Exh. 2 to Hollis Aff.)

plaintiff cannot establish the last element of a hostile environment claim – that SouthTrust knew or should have known of the harassment and failed to take prompt remedial action. Where the employer has no knowledge of the alleged harassing conduct of a coworker, there can be no liability for sexual harassment under Title VII. *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1363-65 (11th Cir. 1999). An employer is not liable where the alleged harassment stops after an employer takes remedial action. *See, e.g., Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (holding that employer was not liable where it immediately began investigation into allegations of harassment); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989) (no liability for corporate employer where it took prompt action to complaint of sexual harassment, noting of special importance that the harassment ended after the remedial action).

In this case, plaintiff admits that she never reported any of Merrill's alleged threats or alleged inappropriate touching to anyone at SouthTrust. (Pl. Depo. pp. 251-52.) The first time SouthTrust became aware of plaintiff's allegations was five days after SouthTrust employee Merrill reported that plaintiff was sexually harassing him. (Hollis Aff. ¶ 7.) At no point during the almost three-month period that plaintiff was on assignment with SouthTrust did plaintiff report any conduct on the part of Merrill to anyone, much less anyone at SouthTrust. (Pl. Depo. pp. 251-52).[9] Only after Merrill reported that plaintiff was sexually harassing him did plaintiff report to Vinson that Merrill was sexually harassing her. In plaintiff's own words, the reason she

---

[9]Plaintiff asserts that SouthTrust had actual knowledge of Merrill's alleged conduct because Merrill allegedly introduced plaintiff as his "new wife" to Merrill's supervisor. (Pl. Depo., pp. 190, 196). Assuming this is true, it is not evidence of sexual harassment and is not sufficient to place SouthTrust on notice of the type behavior Merrill allegedly engaged in.

reported the alleged harassment at that time was an attempt on her part to "beat [Merrill] to the punch." (Pl. Depo. p. 272.)  At the time plaintiff reported the alleged sexual harassment to Vinson, she was no longer working with Merrill and no alleged sexual harassment had occurred since the time Merrill was assigned to a different shift (which was unrelated to any of the alleged conduct). (Pl. Depo. pp. 263-64, 379-80.)  Finally, after SouthTrust learned of the dual complaints, it promptly conducted a comprehensive investigation. (Hollis Aff. ¶ 7-9.)

Based on SouthTrust's lack of actual or constructive notice of the alleged harassment, as well as its prompt remedial action when apprised of the complaints, the court is of the opinion that plaintiff has failed to set forth sufficient evidence on which a reasonable jury could find that SouthTrust knew or should have known of the alleged harassment and failed to take prompt remedial action.  Consequently, the plaintiff's claim of sexual harassment is due to be dismissed as a matter of law.

**D.    Plaintiff's Race Discrimination Claim**

In the Complaint, plaintiff alleges that SouthTrust discriminated against her claiming that African-American employees were treated differently than Caucasian employees in violation of Title VII. (Complaint ¶ 26.)  In order to present a prima facie case of race discrimination, plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated white employees more favorably; and (4) she was qualified to do the job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

As discussed above, plaintiff was not an employee of SouthTrust and therefore has no standing to assert a claim for disparate treatment based on race.  However, even if plaintiff has

standing to assert a disparate treatment claim against SouthTrust, plaintiff cannot establish a

prima facie case of discrimination. In her deposition, plaintiff testified that she believed she was

discriminated against based on her race because Merrill had an obsession for black women,

compared himself to black men, and used her "as an object in a sense to get his fantasies

fulfilled." (Pl. Depo. pp. 276-277.) Plaintiff testified in her deposition:

> I think that had I been a white woman sitting in that position that he had this type
> of urge or this type of desire for me, I may have been treated different. Maybe I
> wouldn't have been threatened in my position. Maybe, you know, maybe I
> would have been – he wanted to go out to lunch. Maybe it would have been
> altogether different. He may have discussed me with friends or something like
> that, you know, so, I don't know.

(Pl. Depo. p. 277.) Plaintiff testified that this was the only reason she believed she had been

discriminated against because of her race. (Pl. Depo. p. 277.)

Even assuming plaintiff can establish the other elements of a prima facie case of race

discrimination, plaintiff did not and cannot identify any similarly situated white employees who

were treated more favorably. Instead, she asserts that she may have been treated differently if

she were a white employee. Plaintiff's speculation does not constitute evidence of race

discrimination. "Inferences and opinions must be grounded on more than flights of fancy,

speculations, hunches, intuition or rumors; discrimination law would be unmanageable if

disgruntled employees could defeat summary judgment by speculating about the defendant's

motives." *Lewis-Webb v. Qualico Steel Co.*, 929 F. Supp. 385, 392 (M.D. Ala. 1996) (quoting

*Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994)). Plaintiff cannot establish a claim

for race discrimination and therefore, SouthTrust is entitled to judgment as a matter of law as to this claim.[10]

**E.     Plaintiff's Retaliation Claim**

Plaintiff alleges in Count VII of the Complaint that SouthTrust discharged her in retaliation for her complaints of sexual harassment. (Complaint ¶ 40). A plaintiff alleging Title VII retaliation must establish a prima facie case of retaliation by demonstrating that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and, (3) the adverse action was causally related to the plaintiff's protected activities." *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997).

As discussed above, because SouthTrust was not plaintiff's employer, it cannot be held liable under Title VII for any alleged retaliation. However, even if SouthTrust were considered plaintiff's employer, plaintiff has not established a prima facie case of retaliation.

First, there is no evidence that SouthTrust took any adverse employment action against plaintiff. Plaintiff alleges in the Complaint that SouthTrust discharged her because of her complaints of sexual harassment. SouthTrust, however, did not have the authority to fire plaintiff and therefore, could not have discharged plaintiff. (Hollis Aff. ¶ 11.)

Further, plaintiff testified in her deposition that she voluntarily resigned from her job at Vinson. (Pl. Depo. pp. 281-82.) Plaintiff later testified in her deposition that she never resigned from Vinson Guard Services and that Vinson never terminated her services. (Pl. Depo. pp. 285-86.) Because SouthTrust did not have the authority to discharge plaintiff, and because plaintiff

---

[10]Plaintiff did not provide any evidence in opposition to this claim and, at the hearing on summary judgment, plaintiff's counsel orally waived this claim.

testified that she either voluntarily resigned or was never terminated from her employment with Vinson, the court is of the opinion that plaintiff has not set forth sufficient evidence on which a reasonable jury could find that SouthTrust took any adverse action against her. Therefore, plaintiff's claim of retaliation is due to be dismissed as a matter of law.

Even if plaintiff can establish that SouthTrust had some influence over plaintiff's employment with Vinson, plaintiff cannot establish the causal connection element of a retaliation prima facie case. The only request SouthTrust made regarding Vinson's assignment of plaintiff was to temporarily reassign plaintiff to another location due to SouthTrust's own employee Merrill's October 2, 1998, report of the alleged harassment by plaintiff. (Hollis Aff. ¶ 8.) There is no evidence that SouthTrust influenced Vinson's alleged decision to terminate plaintiff. Further, there is no evidence that SouthTrust asked for the reassignment because of plaintiff's complaints of sexual harassment.[11] Thus, plaintiff has failed to set forth sufficient evidence on which a reasonable jury could find that any adverse employment action was causally linked to her complaints of sexual harassment.

Even assuming that plaintiff could establish a prima facie case of retaliation, plaintiff cannot rebut SouthTrust's legitimate, nondiscriminatory reason for any action taken against plaintiff – that SouthTrust took the action in response to complaints by SouthTrust employee Merrill that plaintiff had sexually harassed him. Merrill reported plaintiff's sexual harassment of

---

[11]Additionally, plaintiff testified that after she reported Merrill's alleged conduct to Vinson Guard Service, she was offered three options for a transfer, including another SouthTrust assignment at a different location. (Pl. Depo. pp. 266-268.) Therefore, even if SouthTrust played a role in plaintiff's temporary transfer from one SouthTrust location, SouthTrust did not prevent plaintiff from working at other SouthTrust locations.

him on October 2, 1998, before SouthTrust was notified by Vinson that plaintiff complained that

Merrill was harassing her.  SouthTrust had a duty to investigate the complaints of sexual

harassment of its own employee and plaintiff cannot rebut the legitimate, nondiscriminatory

reason for SouthTrust's actions.  Consequently, even if plaintiff could establish a prima facie

case, plaintiff has not set forth sufficient evidence on which a reasonable jury could find that

defendant's legitimate, nondiscriminatory reason was pretext for unlawful retaliation.

**F.      Plaintiff's State Law Claims**

      *1.      Assault and Battery; Invasion of Privacy*

Plaintiff alleges the state tort claims of assault and battery and invasion of privacy in

Counts IV and V of the Complaint.  For an employer to become liable for the alleged intentional

torts of its agent, the plaintiff must offer evidence that "(1) the employee's acts are committed in

furtherance of the business of the employer; (2) the employee's acts are within the line and scope

of his employment; or (3) the employer participated in, authorized, or ratified the wrongful act."

*Ex parte Atmore Community Hospital*, 719 So. 2d 1190, 1194 (Ala. 1998).

        <u>**a.      Furtherance of Business**</u>

"This Court has stated that tortious acts furthered an employer's business where, for

example, a defendant undertaker refused to release the body of the plaintiff's husband until the

plaintiff had paid for services rendered, *Levite Undertakers Co. v. Griggs*, 495 So.2d 63 (Ala.

1986), and where the defendant used threatening or abusive behavior in an attempt to coerce the

plaintiff into dropping his claim, *National Security Fire & Casualty Co. v. Bowen*, 447 So.2d

133 (Ala. 1983)." *Atmore Community Hospital*, 719 So.2d at 1194.  "In contrast, where a

co-employee defendant's behavior is aimed at 'satisfying [the co-employee's] own lustful

- 25 -

desires,' this Court has held that 'no corporate purpose could conceivably be served.'" *Id.* (quoting *Busby v. Truswal Systems Corp.*, 551 So.2d 322, 327 (Ala. 1989)).

The evidence in this case shows that the alleged acts by Merrill were purely personal and not for the benefit of SouthTrust. Plaintiff testified in her deposition that she was the "target" of defendant Merrill's "obsession for black women and comparing [himself] to black men." (Pl. Depo. p. 276.) Plaintiff's own testimony demonstrates that plaintiff believed that Merrill was committing the alleged acts out of his personal obsession for black women, conduct which, if it actually occurred, could only be for Merrill's own "lustful desires." As the Alabama Supreme Court has held, there is simply no conceivable corporate purpose to be served by Merrill's alleged conduct. *Atmore Community Hospital*, 719 So. 2d at 1194 ("Turner's evidence of Hayes's alleged battery and invasion of privacy indicates that Hayes's alleged conduct was aimed solely at satisfying his own lustful desires. Thus, Turner failed to present substantial evidence on which Atmore Hospital could be liable for a battery or invasion of privacy by Hayes on the grounds that his conduct furthered the hospital's business.")

### b.    Line and Scope of Employment

"An employee's tortious acts occur within the scope of his employment if the acts are 'so closely connected with what the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.'" *Id.* (quoting Prosser & Keeton, The Law of Torts 503 (5th ed. 1984)). "In *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1002 (Ala. 1993), this Court held that there was sufficient evidence that a store manager who falsely imprisoned a customer suspected of shoplifting was acting within the scope of his employment because

- 26 -

preventing shoplifting was closely related to his employment as a store manager." *Atmore Community Hospital*, 719 So.2d at 1194. "In contrast, where the store manager forced the customer to perform a sexual act with him, this Court has held that the manager was acting outside the scope of his employment." *Id.* (citing *Big B*, 634 So.2d at 1002); *see also Hendley v. Springhill Mem'l Hosp.*, 575 So.2d 547 (Ala. 1990) (holding that a hospital is not liable for the unauthorized sexual touching by an agent); *Doe v. Swift*, 570 So. 2d 1209 (Ala. 1990) (holding that conduct by state psychologist in engaging in sexual intercourse with patient was not for benefit of his employer and was not committed while in performance of his official duties in line and scope of his employment).

In this case, plaintiff's proffered evidence shows that Merrill's alleged actions were entirely personal in nature and not within his assigned duties. Thus, plaintiff was not acting within the scope of his employment when making these alleged personal advances. *Atmore Community Hospital*, 719 So.2d at 1194-95 ("Turner's evidence of Hayes's alleged battery and invasion of privacy shows that his conduct was entirely personal in nature and not within his assigned duties. Thus, Turner failed to present substantial evidence on which Atmore Hospital could be liable for these claims on the grounds that Hayes's conduct was within the line and scope of his duties.")

### c.    Ratification

"An employer is also liable for the intentional torts of the employee if the employer ratifies the employee's conduct." *Atmore Community Hospital*, 719 So.2d at 1195 (citing *Potts v. BE & K Constr. Co.*, 604 So.2d 398, 400 (Ala. 1992)). "An employer ratifies conduct if: (1) the employer has actual knowledge of the tortious conduct; (2) based on this knowledge, the

employer knew the conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation." *Id.* "Adequate" means that the employer took reasonable and necessary steps to stop the tortious conduct. *Id.* "In *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 (Ala.1995), this Court held that a plaintiff presented substantial evidence of inadequate corrective action by an employer by showing that the employer failed to investigate or reprimand the co-employee accused of assault and battery." *Id.* "In contrast, where the specific tortious conduct stops after corrective action by the employer, this Court has held that the corrective action is adequate as a matter of law." *Id.* (citing *Potts*, 604 So.2d at 401).

The evidence in this case shows that when apprised of plaintiff's allegations, Southtrust took prompt corrective action. As discussed above, SouthTrust promptly and thoroughly investigated the complaint of sexual harassment made by its own employee Merrill and interviewed the employees who worked with Merrill and plaintiff. (Hollis Aff. ¶ 9). After a thorough and comprehensive investigation of Merrill's complaints, SouthTrust concluded that there may have been evidence of a consensual relationship, but that the allegations of both Merrill and plaintiff were simply a "he said, she said" situation. (Hollis Aff. ¶ 9.) At the conclusion of the investigation, and even before plaintiff reported the alleged conduct to Vinson, no further conduct occurred. (Pl. Depo. p. 379-80.) Consequently, plaintiff has not set forth sufficient evidence on which a reasonable jury could find that defendant ratified Merrill's alleged conduct. *Atmore Community Hospital*, 719 So.2d at 1195 ("Turner's evidence of Hayes's alleged battery and invasion of privacy shows that this conduct stopped after Turner reported the conduct to Henley and Henley ordered Hayes to cease such conduct.")

- 28 -

Based upon the undisputed material facts, plaintiff's claims for assault and battery and invasion of privacy against SouthTrust are due to be dismissed.  Therefore, defendant SouthTrust is entitled to summary judgment dismissing plaintiff's claims for assault and battery and invasion of privacy.

### 2.    *Negligent Hiring, Training and Supervision*

Plaintiff alleges in Count III that SouthTrust negligently hired, trained and supervised Merrill.  "An employer may be held responsible for its employee's incompetence when that employer has notice or knowledge, whether presumed or actual, of such incompetence." *Zielke v. AmSouth Bank, N.A.*, 703 So. 2d 354, 358 (Ala. Civ. App. 1996) (citing *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993)).

During her three-month assignment at SouthTrust plaintiff never reported any of Merrill's alleged conduct to anyone at SouthTrust.  (Pl. Depo. pp. 251-52).  Only after Merrill reported that plaintiff was sexually harassing him did plaintiff inform her employer Vinson of any alleged harassment.  By the time plaintiff reported the alleged harassment to her employer Vinson, plaintiff no longer worked on the same shift as Merrill.  Further, according to plaintiff, all of the alleged conduct occurred during the first three days of her SouthTrust assignment.  Finally, plaintiff has not produced any evidence that SouthTrust had notice of any alleged inappropriate conduct by Merrill or that SouthTrust should have known of any of the alleged conduct.[12]

---

[12]As set forth above, the court is of the opinion that the alleged introduction by Merrill of plaintiff as his "new wife" to Merrill's supervisor is not sufficient to place SouthTrust on notice that Merrill was sexually harassing plaintiff.

Because SouthTrust had no actual or constructive knowledge of Merrill's conduct until long after the alleged actions occurred, the court is of the opinion that plaintiff has not set forth sufficient evidence on which a reasonable jury could find that SouthTrust negligently hired, trained, or supervised Merrill.  Thus, SouthTrust is entitled to judgment as a matter of law as to plaintiff's claim for negligent hiring, training, and supervision.

### 3. *Negligent Investigation*

In Count VI of the Complaint, plaintiff alleges that SouthTrust negligently investigated her reports of sexual harassment.  No separate cause of action for negligent investigation exists under Alabama law.  The Alabama Supreme Court has recently held that an employer's alleged negligent investigation of a sexual harassment complaint could provide the basis for the tort of negligent supervision, but does not create a separate cause of action.  *Stevenson v. Precision Standard, Inc.*, Nos. 1970642, 1971194, 1971222, 1999 WL 722691, at *4 (Ala. September 17, 1999) ("the manner in which a sexual harassment complaint is handled when sexual harassment has, in fact, occurred could form the basis of a claim for negligent or wanton supervision").  Thus, this claim is without merit.

Furthermore, even if such a claim existed, the court is of the opinion that SouthTrust was not negligent in its investigation.  Plaintiff reported alleged sexual harassment by Merrill to her employer Vinson on October 7, 1998, five days after SouthTrust employee Merrill reported sexual harassment by plaintiff.  As discussed above, SouthTrust promptly and thoroughly investigated the complaint of sexual harassment made by its own employee Merrill and interviewed the employees who worked with Merrill and plaintiff.  (Hollis Aff. ¶ 9.)  Plaintiff has produced no evidence that SouthTrust negligently handled the reports by its employee Merrill

- 30 -

and the notification of plaintiff's complaints by her employer Vinson. After a thorough and comprehensive investigation of Merrill's complaints, SouthTrust concluded that there may have been evidence of a consensual relationship, but that the allegations of both Merrill and plaintiff were simply a "he said, she said" situation. (Hollis Aff. ¶ 9.) At the conclusion of the investigation and even before plaintiff reported the alleged conduct to Vinson, no further conduct occurred. (Pl. Depo. p. 379-80). Consequently, the court is of the opinion that even if the tort of negligent investigation exists, plaintiff has failed to set forth sufficient evidence on which a reasonable jury could find that SouthTrust negligently investigated plaintiff's complaints.

### III. CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant SouthTrust Bank of Alabama, N.A., is entitled to judgment as a matter of law. An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this ___7th___ day of August, 2000.

*Sharon Lovelace Blackburn*

**SHARON LOVELACE BLACKBURN**
United States District Judge

- 31 -